IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEPHEN THORP,               )
                             )
            Petitioner,      )
                             )
      v.                     )      Case No.  4:03CV1391 HEA
                             )
DAVE DORMIRE,                )
                             )
            Respondent.      )

## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner Stephen Thorp. Thorp seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, habeas relief shall be denied as to all claims, except Petitioner's claim that he received ineffective assistance of trial counsel due to counsel's failure to move, on the basis of the statute of limitations, for dismissal of the armed-criminal-action charge against Petitioner.

## BACKGROUND

On December 12, 1993, the body of Richard Gillenwater, who had disappeared on November 30, 1993, was found in a field near Perry, Missouri.  He had died of two shotgun blasts to the back of his head.  On October 2, 1995, Petitioner was charged with first-degree murder for the killing of Gillenwater.  On April 23, 1996, the case was dismissed without prejudice.  On August 1, 1997, the

information in the present case was filed, this time charging Petitioner with first-degree murder for killing Gillenwater by shooting him sometime between November 30, 1993 and December 12, 1993, while acting with another (Rusty Davis) (Count I); and with armed criminal action relating to the murder (Count II).

Petitioner was convicted by a jury on July 31, 1999, of one count of second-degree murder and one count of armed criminal action. He was sentenced to consecutive terms of imprisonment of thirty years and seven years, respectively. The convictions and sentences were affirmed on direct appeal on December 7, 1999. Petitioner filed a timely motion for post-conviction relief on June 1, 2000. The motion was denied on the merits on November 16, 2001, and this denial was affirmed on appeal on October 8, 2002, with the mandate issued on January 16, 2003.[1]

The present action is deemed filed on September 29, 2003, when it was received by the Court. In his amended petition for habeas relief, Petitioner asserts that his constitutional rights were violated in numerous ways, including, but not limited to, the following:

> (1) The trial court improperly precluded Petitioner from presenting evidence that connected four other people (Michael Cook, Billy Reid, Susie Merenda, and Russell Brunning) to the murder;

> (2) The trial court improperly limited Petitioner's cross-examination

---

[1] See www.courts.mo.gov/casenet/ Case No. ED80674.

of a State's witness (Stephen Ruedlinger);

   (3) The trial court improperly refused Petitioner's request to endorse and call
   a witness whose testimony would have suggested that a State's witness
(James Blumke) testified in exchange for a deal with the State;

   (4) The trial Court improperly denied Petitioner's motion for a
   mistrial after a police officer (Ernest Schroeder) testified that evidence
   supported the story of a key witness for the State (James Stephenson)
   and that the witness had agreed to take a polygraph test; and

   (5) Trial counsel rendered ineffective assistance by not moving for the
   dismissal of the armed-criminal-action charge on the ground that the
   three-year statute of limitations had run.

   Respondent argues that this Court is procedurally barred from considering

Petitioner's claims other than the five claims described above, and that Petitioner is

not entitled to habeas relief on the five properly-preserved claims because the state

courts' adjudication of them did not involve an unreasonable application of clearly

established Supreme Court law or an unreasonable determination of the facts.

## BACKGROUND

### Trial Proceedings

### State's Motion to Preclude Evidence Linking Others to the Crime

   On January 5, 1998, the trial court granted the State's motion in limine to

prohibit the defense from presenting evidence that linked others, specifically,

Cook, Reid, Merenda, and/or Brunning, with Gillenwater's murder.  The court

stated that it would allow defense counsel to make an offer of proof at some later

date and would consider changing its ruling at that point.  Resp. Ex. A-1 at 130-38.

The jury was then sworn in, but on the following day, a mistrial was declared upon Petitioner's request for additional time to conduct an investigation. Resp. Ex. A-3 at 499.

On June 19, 1998, the trial court held an evidentiary hearing on the State's motion in limine noted above. Three witnesses were called: police officer Michael Platte, William Kuda, and Brunning. Platte testified that he was put in charge of the investigation shortly after Gillenwater's body was found. He testified that evidence at the site suggested that the body had been dragged to where it was found; that a large flashlight with bloody human tissue on it was found near the body; and that no shotgun shells were found in the field. Resp. Ex. A-3 at 505-14.

Platte testified that Cook, Reid, and Brunning became suspects early in the investigation when a police officer noticed that a composite drawing, prepared in the case with the assistance of an individual named Rodney Schutte, resembled Brunning. The drawing was of an individual Schutte claimed he had seen sitting in Gillenwater's pickup truck on the night Gillenwater disappeared, near the field where the body was found. Platte testified that he interviewed Brunning on December 22, 1993, and that based upon what Brunning told him and upon evidence at the field, Platte believed that Gillenwater had been killed in the back of Cook's residence, where Cook lived with Merenda (his girlfriend). This residence was six or seven miles from the field and along the same road. Platte testified

that he obtained a search warrant for Cook's premises and that pursuant to the search, one or more shotguns, a bottle of Yukon Jack whiskey, and a stop sign with bullet holes in it were found and seized, all items which tended to corroborate Brunning's story. Id. at 517-37.

On cross-examination, Platte testified that it was an "equally likely probability" that Gillenwater was shot and killed in the field as that he was shot somewhere else and dumped in the field. Platte further testified that the search of Cook's residence revealed nothing to directly link Cook to the murder, and that thereafter, Platte changed his mind as to whether Gillenwater had been killed at the Cook residence, based upon other and new evidence in the case. Id. at 543-50.

Kuda testified that he grew up with Gillenwater and knew that Merenda was having an affair with Gillenwater, although he did not know whether Cook knew about this. He testified on cross-examination that it was common knowledge that Merenda had affairs with a lot of people and common knowledge that Cook knew about this. Id. at 556-57.

Brunning testified that he and his friend Reid would "hang out" at Cook's residence on a daily basis. He testified that he also knew Gillenwater and had seen Cook and Gillenwater together on several occasions. Brunning testified that during the December 22, 2003 interview with Platte, Platte suggested to him a version of events that took place at Cook's residence on the evening of November

30, 2003, and that he (Brunning) assented to Platte's version, adding some facts of his own, even though Platte's version was not true. Brunning testified that he refused to sign the written statement Platte prepared for him, and that following the interview he (Brunning) contacted his attorney and told him that the statement was untrue. Id. at 559-94.

Platte was then recalled as a witness and testified that after he indicated to Brunning at the interview that Brunning could be implicated in the crime if he knew facts that he was not disclosing, Brunning told Platte the following: He and Reid were with Cook and Merenda at Cook's residence on the evening of November 30, 2003, when Gillenwater showed up at about 8:00 p.m. carrying a bottle of Yukon Jack and interested in selling a rifle. The people present drank some beer and whiskey and ingested some Valium. Cook, Reid, and Gillenwater went outside to test the rifle and Brunning heard three shots that sounded like metal was hit, and then another shot, after a pause, that sounded like a thud. Cook came back inside and called to Merenda in an urgent voice, and Merenda then drove Brunning home. Platte denied asking Brunning any leading questions and testified that Brunning presented this factual scenario independent of any suggestions by Platte. Id. at 608-27.

Platte testified that when he was getting ready to leave the interview room, Brunning told him that everything he (Brunning) had said was a lie, but Platte did

not believe him.  The next morning, Platte was told that Brunning had recanted his statement, and on January 7, 1994, Platte again saw Brunning, at which time Brunning recanted his story of December 22, 2003.  The results of a lie-detector test indicated that the December 22, 2003 story related by Brunning was a lie, and the Cook/Reid/Merenda/Brunning line of investigation ended.  Id. at 632-42.

On defense counsel's suggestion, the court stated that it would decide whether to change its previous decision granting the State's motion to exclude evidence suggesting that Cook, Reid, Merenda, and/or Brunning murdered Gillenwater, after it could evaluate the strength of the State's evidence against Petitioner at trial.  Id. at 669-70.  There is no record that the matter was revisited.

Evidence at Trial

The State presented evidence that at approximately 6:45 p.m. on November 30, 1993, Schutte was driving on the road by the field where Gillenwater's body was found, and saw Gillenwater's pickup truck parked at the entrance to the field.  The police prepared a composite drawing of a man Schutte saw sitting in the truck, and in a photo array, Schutte pointed to a picture of James Stephenson and another individual as bearing a resemblance to the man in the truck.  The police interviewed Stephenson, and after he was granted immunity from prosecution, he told police officer Ernest Schroeder that he witnessed Davis and Petitioner kill Gillenwater at around dusk the evening of November 30, 1993.

Stephenson testified that on that day, he, Petitioner, and an individual named Larry Twyman drove to Perry, Missouri, in Petitioner's truck and met Davis and Gillenwater there. Stephenson testified that the four men drove along a gravel road, with Davis driving Gillenwater's truck and Petitioner driving his own vehicle. They stopped alongside the field in question, and as it got dark, Davis, Gillenwater, Twyman, and Petitioner walked into the field for what Stephenson believed was a drug deal. Stephenson then saw Davis hit Gillenwater in the back of the head, causing Gillenwater to fall down. Stephenson heard a loud boom and began walking towards the other men. He saw Petitioner with a gun about 18 inches long pointed towards the ground where Gillenwater was lying on his stomach.

Stephenson testified that Petitioner noticed him and told him to get back to the truck. Stephenson stood there for a minute and Twyman grabbed him by the arm and began walking back to the truck with him, when Stephenson heard another boom. A few minutes later, Davis and Petitioner returned to the vehicles and Petitioner told Stephenson to get in Gillenwater's truck and follow them back to Gillenwater's house. Stephenson got in the truck, at which point another truck came down the road and Davis, Twyman, and Petitioner jumped into the bushes. When the other truck passed, the three men got into Petitioner's truck and drove to Gillenwater's house, with Stephenson following in Gillenwater's truck. Petitioner

drove Stephenson home from there.

Officer Schroeder testified that despite inconsistencies in Stephenson's story, there were several things that caused him to believe the story. The court sustained defense counsel's objection that this was an improper comment upon a witness's testimony. Resp. Ex. A-8 at 1537. Shortly thereafter, Schroeder testified that Stephenson had agreed to take a polygraph test. Defense counsel moved for a mistrial, arguing at the bench that this statement was improper and noting a pretrial agreement that polygraph evidence would not be mentioned. The prosecutor stated that the State did tell its witnesses at the beginning of the trial not to mention polygraph tests, but that Schroeder might have forgotten. The court denied the motion for a mistrial, but granted counsel's alternate request to allow admission of the fact that the results of Stephenson's polygraph test were inconclusive, and counsel elicited this fact on cross-examination of Schroeder. Id. at 1554-63.

The State introduced into evidence a shotgun seized during a traffic arrest of Davis about 14 months after Gillenwater's body was found, contending that it was the murder weapon. The State also presented the testimony of Stephen Ruedlinger, who testified that in early 1998, he was housed with Petitioner in a county jail and Petitioner demonstrated to him how he had used a sawed off shotgun to kill Gillenwater and stated to him that the gun was recovered two years later when Davis was arrested. Resp. Ex. A-9 at 1656-59. During direct examination,

Ruedlinger admitted that he came forward with this information in the hope that it would help him with a pending stealing charge. He also admitted that in exchange for his truthful testimony, he received a plea agreement in the stealing case pursuant to which he pled guilty, paid $3,000 in restitution, and received a five-year suspended sentence. Id. at 1664.

During cross examination, defense counsel reviewed Ruedlinger's extensive criminal history, as well as occasions on which Ruedlinger had lied to a court. When counsel questioned Ruedlinger about a statement he had made to the police upon his arrest on the above-referenced stealing charge, the State objected. The State maintained that questioning the witness about the statement was an impermissible attempt to delve into the details of Ruedlinger's conviction and also an improper attempt to impeach Ruedlinger with a prior bad act. Defense counsel maintained that Ruedlinger lied in the statement and that this was proper impeachment evidence. Defense counsel also argued that the fact that Ruedlinger first lied to the police to get out of the stealing charge, and then offered to testify about Petitioner to get out of the same charge was directly relevant to show that he lied on the stand about Petitioner. The trial court ruled that Ruedlinger's statement to the detective at the time of his arrest for stealing was inadmissible. Id. at 1674-88. Cross-examination of Ruedlinger continued, with defense counsel asking him about the agreement he entered into with the State in exchange for his testimony,

as well as about his testimony itself.  Id. at 1714-27.

Another witness for the State was James Blumke, who was a state prisoner at the time of the trial.  He testified that in late 1995, he was housed with Petitioner at a county jail and Petitioner told him that he shot Gillenwater.  According to Blumke, Petitioner told him that Davis had knocked Gillenwater to the ground and that Petitioner thereafter used a shotgun to shoot Gillenwater once and then blew Gillenwater's head off to finish him off.  Blumke testified that Petitioner told him that he and Davis killed Gillenwater because Gillenwater owed them money. Blumke said that in early 1996, when he was out of jail, he gave this information to officer Schroeder, whom he had known since childhood, and that he did not provide the information as part of any kind of deal.  Resp. Ex. A-6 at 1081-85.

Defense counsel cross-examined Blumke with his long criminal history; with his oral and written statements to defense counsel during counsel's investigation that he did not remember Petitioner telling him anything about killing anybody; and with the fact that when he was housed with Petitioner in jail, Petitioner had a lot of paper work about his case with him (which Blumke might have read to learn facts he told the police).  Id. at 1086-1107.  On recross, Blumke stated that one year prior, when he was back in prison, he did not make parole; that he thought the reason had to do with Petitioner's case; and that he wrote the prosecutor in this case that he would just do the rest of his time and was mad about

it.  Id. at 1116.  On redirect, Blumke acknowledged that at one point he thought the prosecutor was purposely keeping him in prison, but that he currently knew that was not so.  Id. at 1118.

Two days after Blumke testified, the defense asked the court for permission to endorse a new witness -- jailer Richard Cook, who was with Blumke when he was to be taken back to prison after he testified.  Defense counsel related that the defense had just learned that Blumke became very upset when he was to be transferred back to prison, insisting that he was to be released and telling Cook to check with the prosecutor or her investigator.  Id. at 1929.  The prosecutor opposed the motion, stating as follows:  "[F]rom my conversations with Mr. Blumke, the only thing that he's been waiting on is a free bed in a halfway house, which is what they do with them on conditional release.  And it's true, he was going to go from here to the halfway house.  He did not in fact go from here to the halfway house.  He went back to [prison].  So I think that the witness doesn't have anything to add."  Id. at 1930.

The trial court asked defense counsel whether Blumke had told Richard Cook that because he came and testified, he was made a promise, and counsel responded, "I think that was the clear indication."  Later in the discussion, defense counsel conceded that Blumke did not tell Richard Cook that Blumke had an agreement with the prosecutor which the prosecutor was not keeping.  The

prosecutor denied having had any communication with Blumke's parole board or having done anything to keep him in, or get him out of, prison. She stated that at one point, Blumke blamed her for his not making parole, but that she told Blumke that it was not her fault, and that at the time he testified, he did not believe that it was. After hearing argument by defense counsel on the motion to endorse Richard Cook, the court denied the motion. Id. at 1929-35. During closing argument, the prosecutor told the jury that Blumke did not get a deal in exchange for his testimony. Resp. Ex. A-11 at 2087.

**Direct Appeal**

Petitioner raised five claims on direct appeal. He argued that the trial court committed reversible error and violated Petitioner's constitutional rights in (1) precluding Petitioner from presenting evidence connecting Cook, Reid, Merenda, and/or Brunning to the Gillenwater's murder, where this evidence showed these individuals' opportunity and motive to commit the crime; (2) precluding Petitioner from effectively confronting Ruedlinger to show his motive to lie; (3) refusing to allow Petitioner to endorse and present testimony from Richard Cook showing that Blumke expected to be taken to a halfway house instead of back to prison after he testified; and (4) overruling Petitioner's motion for a mistrial after Officer Schroeder's testimony that Stephenson had agreed to take a polygraph test, and that several things made him believe Stephenson's story. Petitioner presented an

additional claim that is not included in his habeas petition, namely, that the trial court erred in overruling defense counsel's request for individual voir dire of venirepersons who knew Davis, and in subsequently overruling counsel's request for a mistrial when a venireperson stated in front of the whole panel that he knew Davis and thought he was guilty. Resp. Ex. C.

The Missouri Court of Appeals rejected all claims. The court first held that there was no direct evidence linking Cook, Reid, Merenda, and Brunning to the murder, and therefore, the trial court did not err in excluding the evidence in question. Resp. Ex. E. at 2-3. The appellate court held that the trial court did not err in limiting cross-examination of Ruedlinger to the nature, date, place, and sentence of his stealing charge. Id. at 4. The court next held that the exclusion of Richard Cook's testimony did not result in fundamental unfairness to Petitioner because it was conceded that Blumke never told Richard Cook that he was to be released in exchange for his testimony and thus, Richard Cook could not have established that Blumke had such a deal with the State. The court also pointed to the prosecutor's statement that it was her understanding that Blumke was waiting for a bed to open in the halfway house and that he would likely be transported there following the trial, unrelated to his cooperation in this trial. The court also noted that defense counsel cross-examined Blumke regarding his motive for testifying against Petitioner, and Richard Cook did not have evidence that would contradict

Blumke's testimony on this matter.  Id. at 4-5.

With regard to Petitioner's last point on appeal, the appellate court explained that the results of polygraph tests are inadmissable in Missouri courts because the results are not uniformly accepted within the scientific community and contain a high degree of subjectivity.  The court noted, however, that a mistrial is a drastic remedy and that in accordance with Petitioner's request, the jury learned that the results of the test were inconclusive.  The court held that Petitioner was not prejudiced by the admission of the polygraph evidence, and that the trial court did not abuse its discretion in refusing to grant a mistrial.  Id. at 7-8.[2]

**State Postconviction Proceedings**

On June 15, 2000, Petitioner filed a pro se motion for post-conviction relief in state court, raising numerous claims of ineffective assistance of trial counsel and prosecutorial misconduct, and one claim of ineffective assistance of appellate counsel for not raising certain claims on direct appeal.  Resp. Ex. G at 5-20.  On September 13, 2000, appointed counsel filed an amended motion for post-conviction relief, also raising numerous claims of ineffective assistance of counsel, adding the claim that trial counsel was ineffective for failing to move to dismiss the

---

[2]    The Missouri Court of Appeals also held that the trial court did not abuse its discretion in denying Petitioner's motion for a mistrial following a comment by a venireperson that he knew Davis and thought he was guilty.  The court noted that this venireperson did not know Petitioner or express an opinion about Petitioner's guilt.  Resp. Ex. E at 5-6.

armed-criminal-action charge on the basis of the statute of limitations. Appointed counsel maintained that as armed criminal action was an unclassified offense under Missouri law, it carried a three-year statute of limitations under Mo. Rev. Stat. § 556.036, which provides that a prosecution for murder or any Class A felony may be commenced at any time, but a prosecution for any other felony (except several not relevant here) must be commenced within three years.

At a hearing on the post-conviction motion, one of Petitioner's trial attorneys' testified that he did not remember any discussion on the statute of limitations issue once the case had been refiled after the initial dismissal. Resp. Ex. F. at 23-24. The motion court rejected this claim of ineffective assistance, holding that a decision of the Western District of the Missouri Court of Appeals dated February 6, 2001, State v. Hyman, 37 S.W.3d 384 (Mo. Ct. App. 2001), which held that armed criminal action had a three-year statute of limitations which could not be extended when the underlying offense carried a longer limitations period, constituted a change in the law and the failure of counsel to predict this change did not constitute ineffective assistance. The court stated as follows:

> In Hyman, the appellate court reached its decision through statutory construction analysis and without reliance on prior case law. In fact, the appellate court specifically found the holding in State v. Cunningham, 840 S.W.2d 253 (Mo. App. E.D. 1992), to be flawed. The court in Cunningham held that unclassified felonies punishable by life imprisonment were class A felonies and thus not subject to a statute of limitations. Apparently recognizing the affect its decision would have, the appellate court in Hyman called upon the legislature

to make any warranted corrections deemed appropriate. <u>Hyman</u>, 37
S.W.3d at 393.

Resp. Ex. G. at 48-49. The motion court denied relief on all of Petitioner's other
claims as well.

On appeal from the denial of Petitioner's amended motion for post-
conviction relief, Petitioner raised only one point: that trial counsel rendered
ineffective assistance by failing to move for dismissal of the armed-criminal-action
charge on the basis of the statute of limitations. Resp. Ex. I. In affirming the
motion court's decision on this matter, the Missouri Court of Appeals accepted the
motion court's reasoning, stating that the motion court was bound by <u>Cunningham</u>
and that even if <u>Hyman</u> were the law in the Eastern District of Missouri, the motion
court correctly found that the failure to predict a change in the law could not
constitute ineffective assistance of counsel. Resp. Ex. J.

## DISCUSSION

### Procedural Default

Respondent argues that this Court is procedurally barred from considering
all of Petitioner's habeas claims which were not presented in his direct appeal or on
appeal from the denial of his post-conviction motion. The Court agrees. Under the
doctrine of procedural default, a federal habeas court will not review a claim that a
habeas petitioner did not properly present to the state courts, meeting the state's
procedural requirements for doing so. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451

(2000) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 732 (1991)). A state prisoner is generally barred from obtaining federal habeas relief unless the prisoner has properly presented his claims through "one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).

A Missouri inmate procedurally defaults claims which should have been but were not raised on direct appeal or on appeal from the denial of a motion for post-conviction relief. <u>Moore-El v. Luebbers</u>, 446 F.3d 890, 897-98 (8th Cir. 2006) (holding that a Missouri inmate's failure to raise a claim on appeal from the denial of state-post-conviction relief constitutes a procedural default of that claim) (citing <u>Lowe-Bey v. Groose</u>, 28 F.3d 816, 818 (8th Cir. 1994)); <u>Sweet v. Delo</u>, 125 F.3d 1144, 1149-50 (8th Cir. 1997) (same as to claims not raised on direct appeal); <u>Jolly v. Gammon</u>, 28 F.3d 51, 53 (8th Cir. 1994) (stating that in Missouri, a claim must be presented at each step in the judicial process in state court to avoid procedural default).

Here, the only claims raised by Petitioner on direct appeal or on appeal from the denial of his motion for post-conviction relief, are those set out above. Thus, the remaining claims that he raises in his federal habeas petition were procedurally defaulted in state court. A habeas petitioner can overcome the procedural bar to federal habeas review by demonstrating (1) both cause for the default and actual

prejudice therefrom, or (2) that the failure to review the federal claim will result in

a fundamental miscarriage of justice; the "miscarriage-of-justice" exception

permits review of a defaulted claim where a constitutional violation has probably

resulted in the conviction of one who is factually "actually innocent."  House v.

Bell, 126 S. Ct. 2064, 2076-77 (2006) (citing Schlup v. Delo, 513 U.S. 298, 321-24

(1995)).  To show a "miscarriage of justice" in this context requires "new reliable

evidence" that was not presented at trial and that makes it "more likely than not

that no reasonable juror would have found petitioner guilty beyond a reasonable

doubt."  Id.

In his traverse, Petitioner asserts that his procedural defaults were due to

ineffective assistance of counsel on direct appeal and on appeal from the denial of

post-conviction relief.  Ineffective assistance of direct appeal counsel can be cause

to excuse a procedural default of a habeas claim, but this theory itself must not

have been procedurally defaulted in state court.  Edwards, 529 U.S. at 453; Watts

v. Norris, 356 F.3d 937, 941 (8th Cir. 2004).  Here this standard was not met, as no

claim of ineffective assistance of direct appeal counsel was presented to the state

appellate court in the post-conviction proceedings.

In addition, as there is no constitutional right to counsel in state post-

conviction proceedings, the ineffective assistance of post-conviction counsel,

either in the motion court or on appeal, cannot constitute cause to excuse a

procedural default.  See Taylor v. Bowersox, 329 F.3d 963, 971 n.13 (8th Cir.

2003); Oxford v. Delo, 59 F.3d 741, 748 (8th Cir. 1995).  Thus, this Court is barred

from considering the merits of Petitioner's claims other than the five claims

described above which were adjudicated on the merits by the state courts and

properly preserved for federal habeas review.

**Standard of Review**

  Under the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), when a claim has been adjudicated on the merits in state court, an

application for a writ of habeas corpus under 28 U.S.C. § 2254 cannot be granted

unless the state court's adjudication

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

  A decision by a state court is "contrary to" clearly established law of the

Supreme Court if it applies a rule that contradicts the governing law set forth in

Supreme Court cases, or if it confronts a set of facts that are materially

indistinguishable from a decision of the Supreme Court and nevertheless arrives at

a result different from that Court's precedent.  Price v. Vincent, 538 U.S. 634, 640

(2003) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  A state court

"unreasonably applies" clearly established federal law when it "identifies the

correct governing legal principle from [the] Supreme Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case."  Williams,

529 U.S. at 413; see also Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003).

A case cannot be overturned merely because it incorrectly applies federal

law; the application must also be "unreasonable."  Williams, 529 U.S. at 411;

Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003) (stating that under AEDPA, a

writ of habeas corpus may not be granted "unless the relevant state court decision

is both wrong and unreasonable").  The factual findings of the state courts also may

be challenged in a § 2254 petition, but they are subject to "an even more

deferential review."  Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001).

Factual findings by the state courts "shall be presumed to be correct," a

presumption that will be rebutted only by "clear and convincing evidence."  28

U.S.C. § 2254(e)(1).

**Precluding Petitioner from Presenting Evidence Connecting Others to the**

**Murder**

Two principles of clearly established federal law are relevant to Petitioner's

claim based on the exclusion of evidence allegedly linking others to Gillenwater's

murder.  First, the due process clause guarantees a criminal defendant "a fair

opportunity to defend against the State's accusations," which includes the right to present his own witnesses. <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294 (1973). <u>Chambers</u> explained, however, that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." <u>Id.</u> (internal citations omitted). This standard was later clarified by the Supreme Court in <u>Montana v. Egelhoff</u>, 518 U.S. 37 (1996), with the Court stating that the proposition that the due process clause guarantees the right to introduce all relevant evidence is "simply indefensible." <u>Id.</u> at 42. The Court stated that the accused does not have the unfettered right to offer evidence that is inadmissable under standard rules of evidence, such as the rule that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of confusion of the issues or misleading the jury.

The second relevant principal of clearly established federal law is that it is not within a federal habeas court's province "to reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). Rather, a state court's evidentiary ruling can form the basis for federal habeas relief under the due process clause only when it was "so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." <u>Bounds v. Delo</u>, 1521 F.3d 1116, 1119 (8th Cir. 1998).

"To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial -- i.e., that absent the alleged impropriety the verdict probably would have been different." Gee v. Groose, 110 F.3d 1346, 1350 (8th Cir. 1997) (en banc). Rulings on the exclusion of evidence in state trials "rarely rise to the level of a federal constitutional violation. Only the exclusion of critical, reliable and highly probative evidence will violate due process." Nebinger v. Ault, 208 F.3d 695, 697 (8th Cir. 2000).

In Chambers, 410 U.S. at 302-03, a third person on separate occasions orally confessed to the murder with which the defendant was charged to three different friends, under circumstances which bore substantial assurances of trustworthiness. The third person made, but later repudiated, a written confession. The Supreme Court held that the exclusion of the testimony of the persons to whom the oral confessions were made, under the hearsay rule, coupled with the trial court's refusal to permit the defendant to cross-examine the third person, deprived the defendant of a fair trial.

By contrast, here, the state courts found that Petitioner presented no evidence directly connecting Cook, Reid, Merenda, and/or Brunning to Gillenwater's murder. Upon review of the record, this Court cannot say that this represents an unreasonable determination of the facts, or that the decision to

exclude the evidence was contrary to, or involved an unreasonable application, of clearly established Supreme Court precedent.  Cf. Nebinger, 208 F.3d at 696-97 (concluding that any error in exclusion of evidence regarding violent past actions of murder defendant's non-testifying companion, whom defendant claimed had committed the murder, did not rise to level of due process violation).

**Limiting Petitioner's Cross-examination of a State's Witness**

Petitioner claims that he is entitled to habeas relief based upon the trial court precluding defense counsel from inquiring, on cross-examination of Ruedlinger, into the  false statement Ruedlinger made to the police when he was arrested for stealing.  It was this stealing charge that was involved in the deal the State had made in exchange for Ruedlinger's testimony at Petitioner's trial.

In Delaware v. Van Arsdall, 475 U.S. 673 (1986), the Supreme Court reaffirmed that under the Confrontation Clause, "the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  Id. at 678-79.  The Court recognized that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . confusion of the issues, . . . or interrogation that is . . . only marginally relevant."  Id. at 679.  But the Court held that a criminal defendant who was not permitted to offer evidence that a witness was biased by the state's

dismissal of charges against him stated "a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Id. at 680.

The Supreme Court also held that the constitutionally-improper denial of a defendant's opportunity to impeach a witness for bias is subject to a harmless-error analysis, with the correct inquiry being,

> whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, . . . [including] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Id. at 684.

Here, the Court concludes that the state court's adjudication of this issue was not unreasonable in any way. Ruedlinger testified on direct examination that he had been offered a deal with the State in exchange for his testimony, providing the terms of the deal. Defense counsel was permitted to question Ruedlinger extensively about his prior record and about the deal he entered into with the State, as well as about his testimony against Petitioner. The Court perceives no constitutional error in the exclusion of evidence about the statement Ruedlinger

made to the police upon his arrest for the stealing charge. See Newton v. Kemna, 354 F.3d 776, 781 (8th Cir. 2004) (holding that state court's restriction of the scope of cross-examination of a witness did not merit federal habeas relief, where defense counsel had ample opportunity to impeach the character and testimony of the witness).

## Denial of Motion for a Mistrial Following Police Officer's Opinion Testimony on Credibility of Another Witness's Testimony and Officer's Mention of Polygraph Evidence

Petitioner's next claim under review is that the trial court improperly denied his motion for a mistrial after Officer Schroeder testified that evidence supported Stephenson's story and that Stephenson had agreed to take a polygraph test. Whether evidence that is related to polygraph tests may be admitted in a state court trial is a matter of state law. Weston v. Dormire, 272 F.3d 1109, 1113 (8th Cir. 2001). For purposes of habeas review under § 2254, therefore, this Court considers only the question of whether the state trial courts' rulings in Petitioner's case rendered his trial fundamentally unfair. See id. Here, there is no reason to believe that Officer Schroeder's mention of the polygraph test was anything but accidental, and Petitioner was permitted to bring out to the jury that the results of the test were inconclusive. The Court concludes that the state courts' adjudication of this issue was not contrary to clearly established federal law, or based upon an unreasonable determination of the facts, as would support grant of federal habeas corpus relief.

See id. (holding that state trial court's refusal to declare a mistrial on the ground that a police officer made reference to petitioner's polygraph test in violation of a court order did not warrant federal habeas relief, where the officer made no reference to test results, jury showed no apparent reaction to the officer's comment, and petitioner asked the trial court not to give a limiting instruction).

The state appellate court did not deal separately with Petitioner's complaint about Officer Schroeder's comment that several things caused Schroeder to believe Stephenson's story. Indeed, this argument was not raised separately, but only in the context of the challenge to the comment that Stephenson had agreed to take a polygraph test, arguing that the test was one of the things that caused Schroeder to believe Stephenson. In any event, this Court does not believe that Schroeder's comment in question was so prejudicial as to deny Petitioner a fair trial. See Engesser v. Dooley, ___F.3d___, 2006 WL 2135924, at *3 (8th Cir. Aug. 2, 2006) (holding that where police officer's opinion on another witness's credibility was admitted in a state criminal trial, federal habeas court must decide whether the wrong was of constitutional dimension; that is, whether it was so prejudicial as to be fundamentally unfair, thus denying petitioner a fair trial).

The Court notes that the jury was properly instructed that they alone were to determine witnesses' believability, Resp. Ex. B-2 at 306; and that Schroeder's opinion as to Stephenson's credibility was not mentioned by the prosecutor during

closing argument.  See Olesen v. Class, 164 F.3d 1096, 1102 (8th Cir. 1999) (analyzing as similar claim in the context of a claim of ineffective assistance claim, and noting that the admission of the opinion testimony did not result in a trial that was fundamentally unfair, where among other things, jury was instructed that it was the sole judge of witnesses' credibility and prosecutor did not mention the opinion in closing argument).

## Denial of Motion to Endorse and Call an Impeachment Witness

Petitioner argues that his due process right to a fair trial was violated by the trial court's denial of his request to call Richard Cook as a witness.  As noted above, Petitioner wanted to call Richard Cook to impeach Blumke by establishing that contrary to Blumke's testimony, Blumke had entered into a deal with the prosecution in exchange for his testimony in Petitioner's case.  This Court is somewhat troubled by the denial of Petitioner's request to call Richard Cook as a witness, and by the state appellate court's adjudication of this point on appeal. Even though Richard Cook's testimony would not have provided a defense, it might well have suggested to the jury that Blumke testified against petitioner in the expectation that he would receive something from the State, calling into question his credibility.

Nevertheless, the Court cannot say that the state court's adjudication of the matter was objectively unreasonable in light of the facts and Supreme Court

precedent.  Defense counsel conceded that Richard Cook could not testify that Petitioner said he had a deal with the prosecution which the prosecution was not keeping.  The trial court was entitled to credit the prosecutor's statement that indeed there was no deal with Blumke in exchange for his testimony.  Furthermore, applying a harmless error analysis to this claim, the Court concludes that any error on this matter was harmless.  While Blumke's testimony was damaging to Petitioner, it was certainly not critical in light of the overall strength of the State's case, and defense counsel was otherwise allowed to cross-examine Blumke extensively.  In sum, the Court does not believe that Petitioner is entitled to federal habeas relief on this claim.

**Trial Counsel's Failure to Raise Statute of Limitations Defense**

Petitioner argues that trial counsel rendered ineffective assistance in failing to move for dismissal of the armed criminal action charge on the basis of the statute of limitations.  The Sixth Amendment guarantees a criminal defendant the right to effective assistance of trial counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  To succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must establish both "that counsel's representation fell below an objective standard of reasonableness," and that but for counsel's deficiency there is "a reasonable probability" that the result of the trial would have been different.  Id. at 688.  In determining whether the performance of counsel was deficient, the

challenged conduct must be "viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. Counsel's failure to anticipate a change in state law does not constitute ineffective assistance. Parker v. Bowersox, 188 F.3d 923, 929 (8th Cir. 1999).

Error by counsel, even if professionally unreasonable, does not necessarily require that a judgment be set aside. A defendant must affirmatively show prejudice by showing that but for counsel's error, there is a reasonable probability that the result of the proceeding would have been different. Id. at 931. Moreover, in the context of a § 2254 petition, a petitioner "'must do more than show that he would have satisfied Strickland's test if his claims were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner.'" Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004) (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)).

In this case, the Court must determine whether Hyman represented a change in the statute of limitations for armed criminal action under Missouri law, a change which trial counsel could not have been expected to predict. Cunningham involved the crime of forcible rape. This crime was an unclassified felony under Missouri

law, that is, it was not classified as a Class A, B, C, or D felony.  In addition it was a code felony offense, as opposed to a non-code felony offense, because it was part of the 1977 criminal code of Missouri.  Section 557.021, entitled "Classification of Offenses Outside the Code," provides that a non-code offense which carries a penalty of death or life imprisonment or a term of imprisonment of 20 years or more is a Class A felony.  Mo. Rev. Stat. § 557.021.3(1) (a).  Section 556.036(1) provides that murder and Class A felonies have an unlimited statute of limitations.  All other felonies (except several not relevant here) have a three year statute of limitations. Mo. Rev. Stat. § 556.036(2).  Forcible rape carried a possible life sentence. Without any analysis and without noting that forcible rape was a code offense, the court in Cunningham applied § 557.021.3(1) (a) to determine that it was a Class A offense and that hence it had no statute of limitations.  Cunningham, 840 S.W.2d at 253.

Like forcible rape, armed criminal action is a unclassified code offense, with a possible sentence of life imprisonment.  In determining the statute of limitations for armed criminal action when the underlying felony was an sexual offense to which a ten-year statute of limitations applied, the court in Hyman pointed out Cunningham's error in not recognizing that § 557.021.3(1) (a) applied only to non-code offenses.  Thus that section could not be used to classify an unclassified code offense, as Cunningham had done.  The court then explained that armed criminal

action was an offense separate and apart from the underlying felony, and that thus the three-year statute of limitations of § 556.036(2) applied, and not the limitations period of the underlying felony.  Hyman, 37 S.W.3d at 390-93.

The motion court's statement in the present case that Hyman did not rely on prior case law is incorrect.  The court in Hyman relied on prior case law for two key propositions: and that § 557.021.3 was not meant to be used to classify unclassified code offenses, Hyman, 37 S.W.3d at 390-91, and that armed criminal action is an offense separate and apart from the underlying felony, id. at 391-92.  The comment in Hyman regarding the call for legislative action was also misinterpreted by the state courts in the present case.  The motion court read this statement as proof that Hyman represented a change in the law.  This statement rather meant that if the legislature wanted  armed criminal action to carry a statute of limitations other than three years, it could do so by legislative action, but that until it did, the statute of limitations remained three years.  Id. at 393.

The only argument offered by Respondent on this issue is the conclusory statement that the state appellate court's decision on the matter was reasonable. Neither of the state courts, nor Respondent, have cited any cases indicating that after Cunningham and before Hyman, Missouri courts believed that no statute of limitations applied to armed criminal action (or to other unclassified code offenses except those not covered by § 556.036.2).  Nor has the Court's own research

revealed any. This Court believes that the reasoning of the state courts on this claim was unreasonable.

But this does not entirely resolve the matter. <u>Hyman</u> not only explained that <u>Cunningham</u> was incorrect in assigning armed criminal action a ten-year statue of limitations as a Class A felony; <u>Hyman</u> also held that the statute of limitations for armed criminal action did depend upon the limitations period of the underlying felony. The question remains whether a reasonable trial attorney at the time the information in this case was filed on August 1, 1997, before the <u>Hyman</u> decision, would have moved to have the armed-criminal-action charge dismissed as barred by the statute of limitations. The Court believes that this presents a close question. As noted above, in holding that armed criminal action carried its own statute of limitations rather than that of the underlying sexual felony, the <u>Hyman</u> court did not overrule any prior case law which held that the statute of limitations for this offense paralleled the limitations period for the underlying felony. Rather the court relied upon case law, predating Petitioner's crimes here, which viewed armed criminal action as an offense separate from the underlying felony; and upon the facts that armed criminal action carried its own penalty, sentence enhancement, and sentencing provisions; satisfied double jeopardy prohibitions; could be based upon any felony, not just on sexual felonies; and appears in a chapter defining weapons offenses. <u>Hyman</u>, 37 S.W.3d at 391-94.

Hyman certainly clarified the matter, but this Court believes that even before that decision was issued, a reasonable attorney would have moved to dismiss an armed criminal action charge filed more than three years after the crime. Indeed, post-conviction counsel recognized the issue <u>before</u> Hyman was issued. Significantly, as noted above, trial counsel here stated at the post-conviction hearing that he did not recall even considering the statute of limitations issue when the case was refiled. In sum, the Court concludes that the State court's adjudication of this claim was objectively unreasonable. The Court further concludes that trial counsel rendered ineffective assistance in failing to move to dismiss the armed-criminal-action charge on the basis of the statue of limitations.

## CONCLUSION

Petitioner is not entitled to federal habeas relief on any of the claims asserted in his petition, except for the claim that trial counsel was ineffective in failing to move for dismissal of the armed-criminal-action charge on the basis of the statute of limitations.

The Court does not believe that "reasonable jurists" might find the Court's procedural and substantive assessment of Petitioner's claims for habeas relief which are denied "debatable or wrong," for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2253(c)(1)(A). <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003) (standard for issuing certificate of appealability) (quoting <u>Slack v.</u>

McDaniel, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Stephen Thorp for habeas corpus relief is **DENIED** in part and **GRANTED** in part. The petition is denied on all claims except for the claim that trial counsel was ineffective in failing to move for dismissal of the armed-criminal-action charge on the basis of the statute of limitations.

**IT IS FURTHER ORDERED** that Respondent shall set aside Petitioner's conviction and sentence for armed criminal action.

**IT IS FURTHER ORDERED** that a Certificate of Appealability shall be denied on those claims for habeas relief which have been denied.

Dated this 6th day of September, 2006.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE